IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PATRICK MCCOLLUM, et al.,

    Plaintiffs,

v.

THE STATE OF CALIFORNIA et al.,

    Defendants.

No. C 04-03339 CRB

**MEMORANDUM AND ORDER**

    Plaintiff Patrick McCollum, a volunteer Wiccan chaplain for inmates incarcerated by the California Department of Corrections and Rehabilitation ("CDCR"), contends that defendants treat him differently from volunteers of other faiths because he is a Wiccan. He also alleges that defendants have retaliated against him because of his complaints about the CDCR's treatment of Wiccans. Now pending before the Court is defendants' motion for summary judgment on McCollum's equal protection and retaliation claims. After carefully considering the papers and evidence filed by the parties, and having had the benefit of oral argument, the Court concludes that there are no genuine issues of material fact and GRANTS defendants' motion.

**FACTUAL BACKGROUND**

    McCollum is an ordained Wiccan and Pagan Chaplain accredited by Circle Sanctuary, a Wiccan/Pagan denomination with approximately 60,000 members. He is also an ordained Priest with Our Lady of the Wells Church, an ordained Elder Minister with Covenant of

Goddess, a Pagan church. He also has training, certification and extensive knowledge of other Pagan religions.

In 1997 the CDCR asked McCollum to voluntarily minister to Wiccan inmates at California Corrections Institution ("CCI") Tehachapi as part of a settlement of a lawsuit brought by a Wiccan inmate. Three years later McCollum sought the assistance of then-CDCR Director Cal Terhune. Terhune issued McCollum a CDCR-wide identification card and in February 2000, the Community Resources Manager at CCI Tehachapi wrote a "To Whom It May Concern" letter stating that McCollum has access to all 33 CDCR institutions to provide volunteer religious services for the Wiccan faith to inmates.

McCollum contends that notwithstanding his system-wide identification card, he has not been permitted to see inmates at times and in locations that other chaplains are permitted to visit inmates of their faiths, and he has been denied access to chapel time for religious instruction similar to that extended to other volunteer ministers from more established faiths. He also contends that the CDCR denies him benefits extended to other administrative volunteer chaplains, including access to a telephone and a computer. He complains that he has been subjected to more rigorous security scrutiny than volunteers from more traditional faiths. Finally, he alleges that he has been retaliated against by CDCR officials Barry Smith and Sabrina Johnson.

Defendants move for summary judgment on all of McCollum's claims. They contend McCollum's claims fails because (1) they are untimely, and (2) McCollum's evidence is insufficient to support a finding of a constitutional violation.

**SUMMARY JUDGMENT STANDARD**

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party moving for summary judgment that does not have the ultimate burden of persuasion at trial (here the defendants) has the initial burden of producing evidence negating an essential element of the non-moving party's claims *or* showing that the non-moving party does not

2

have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party has satisfied its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996) (internal quotations omitted). Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. See id.

## DISCUSSION

### I.     The Statute of Limitations

Defendants first move for summary judgment on the ground that any claims that arose before January 1, 2003 (when the one-year statute of limitations for tort claims changed to a two-year statute of limitations) are time barred. McCollum agrees with the date, but responds that he is entitled to equitable tolling for a variety of reasons.

#### *A.     EEOC Charge*

First, McCollum claims that his Equal Employment Opportunity Commission ("EEOC") charge filed July 21, 2003 tolled the running of the statute of limitations. "[T]he equitable tolling doctrine requires that the same wrong serve as the predicate for the earlier and later proceedings to make sure defendant received proper notice. In this way, defendant is protected from stale claims. Once notified that a plaintiff seeks a remedy for a certain

wrong, defendant can gather evidence, interview witnesses, and locate documents." Daviton v. Columbia/HCA Healthcare Corp., 241 F.3d 1131, 1141 (9th Cir. 2001).

If the EEOC charge tolled any claims, it would only save claims that arose on or after July 21, 2002–one year prior to the filing of the charge. In any event, the charge does not raise any of the wrongs at issue on defendants' motion for summary judgment; it complains only about the refusal to hire McCollum as a paid chaplain and the CDCR's policy of paying for chaplains of only five faiths: Catholic, Protestant, Jewish, Muslim and Native American ("the Five Faiths" or "Five Faiths Policy"). The charge in no way gives notice of the claims raised by McCollum's retaliation and equal protection causes of action. Accordingly, the EEOC charge did not toll the running of the statute of limitations for the claims at issue on this motion.

### B.     *Continuing Violation*

Next, McCollum contends that all of his claims are timely under the continuing violation doctrine. In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court restricted the "continuing violation" doctrine. There the plaintiff sued under Title VII for various related acts of discrimination. Some of the discriminatory acts occurred within the statute of limitations and some beyond the statute. The Ninth Circuit had held that all of a plaintiff's claims are timely so long as they are "sufficiently related" to incidents that occurred within the statute of limitations. Id. at 105.

The Supreme Court reversed. The Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114. The Court distinguished such discrete acts of discrimination–each of which must be timely challenged–from hostile environment harassment claims. With hostile environment harassment claims the "unlawful employment practice" "cannot be said to occur on any particular day. It occurs over a series of days or

4

perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. at 115. For such claims only one act of the harassment must occur within the statute of limitations. Id. at 117.

While Morgan is a Title VII case, the Ninth Circuit has applied it to section 1983 claims "predicated on discrete time-barred acts, not-withstanding that those acts are related to timely-filed claims." Carpinteria Valley Farms, Ltd. v. County of Santa Barbara, 344 F.3d 822, 828 (9th Cir. 2004). The claims in this lawsuit allege discrete discriminatory acts by different people at different times and at different institutions and thus the continuing violation doctrine is inapplicable. McCollum does not cite any case that suggests the evidence in this case amounts to the type of "pattern and practice" case Morgan did not address.

Accordingly, any claims based on acts by defendants that occurred before January 3, 2003 are barred by the statute of limitations.

## II.     The Equal Protection Claims

"The Equal Protection Clause requires the State to treat all similarly situated people equally." Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008). To survive summary judgment McCollum must present admissible evidence sufficient to support a finding that defendants treated him differently from other similarly situated individuals and that the discrimination was intentional. Flores v. Morgan Hill Unified School Dist., 324 F.3d 1130, 1134 (9th Cir. 2003).

McCollum's evidence is insufficient to survive summary judgment. First, he identifies the evidence described in Section IIB.1 of his Opposition Brief as supporting a finding that he does not have the same access to inmates as volunteer chaplains of the Five Faiths. See Plaintiff's Opposition (Docket No. 337) at 13. For example, he claims that he was denied access to inmates at California State Prison Sacramento during a lock down, but that "other volunteer chaplains were permitted to do so on the same day." McCollum Dec. (Exh. 46) at ¶ 33. His declaration testimony is inadequate to support a finding that McCollum was similarly situated to the other volunteer clergy and that defendants acted with

discriminatory intent. He does not offer any evidence as to which volunteer clergy were allowed access to inmates during the lock down, inmate demand for these volunteers, whether any inmates asked to see McCollum, or even who denied him permission to visit inmates during the lock down.

Next, McCollum states that "[o]n another occasion I was denied the ability to bring musical instruments into an institution while Protestant volunteers were permitted to do the same." Id. Again, McCollum's evidence is insufficient. He does not identify at what institution this incident occurred or who denied him permission; indeed, he does not offer any evidence as to what instruments he was not permitted to bring into the institution.[1] Without evidence as to what instruments were involved a trier of fact cannot conclude that McCollum was treated unequally. And without evidence as to where this incident occurred and who was involved, as well as admissible evidence as to the circumstances of the other volunteer clergy who were purportedly allowed to use musical instruments, a rational trier of fact cannot find intentional discrimination.

McCollum also claims that he would arrive at a prison to conduct services only to find his whole congregation missing because prison staff refused to properly release inmates. The evidence cited--McCollum's declaration--states only:

> Inmates ducated for my services have been denied release to attend them, and inmate ducat lists regularly disappear. Ducat lists have been a continuing problem since I began volunteering with the CDCR in 1997. At Tehachapi, Community Resource Manager Janice Jaffe decided to provide me with hard copies of Wiccan ducat lists due to the risk that they would go missing.

(McCollum's Decl. Exh. 46 ¶ 34). This testimony is not sufficient to support a verdict that McCollum's equal protection constitutional rights have been violated. There is no evidence that other voluntary clergy did not encounter the same difficulties; nor any evidence as to the inmates that were denied access to McCollum's services. Without such evidence a

---

[1] While McCollum's Opposition states that McCollum was denied the ability to bring in two small hand drums and a rattle even though Protestant volunteers brought in guitars to use in their services, Opposition (Docket No. 337) at 4, the evidence cited as support (paragraph 33 of McCollum's declaration) does not include testimony as to the instruments involved.

6

reasonable trier of fact could not find that McCollum was treated differently from other similarly situated voluntary clergy.

McCollum also contends that defendants deny him privileges that they afford volunteer chaplains of the Five Faiths. His supporting evidence is again his declaration:

> I have been denied chapel time for religious instruction similar to that granted to other volunteers. In 2007 I was denied chapel time reserved for Wiccan inmates so that Protestant volunteers without a reservation could perform services. I am also denied administrative benefits, like a telephone or computer access, which other volunteers receive.

(Exh. 46 ¶ 35). This evidence, too, is inadequate. McCollum offers no evidence of the circumstances of the 2007 incident; who, what, where, how. Nor does he explain on what he bases his opinion that he was denied reserved chapel time so that Protestant volunteers could perform services. Without any details a reasonable trier of fact could not find that McCollum was intentionally denied equal protection because of his religion.

The declaration statement as to telephone and computer access is also too thin to support a claim. He offers no evidence as to the access to telephones and computers that other volunteer clergy were given or for what purpose they were given access. He offers no evidence that he ever requested such administrative benefits, and, if so, from whom and where. A jury cannot find a violation of the constitution based solely on McCollum's unadorned statement that he was denied "telephone or computer access, which other volunteers receive."

McCollum next complains that at Corcoran prison institutional guidelines require a showing that religious items sent to inmates are essential to the practice of their religious beliefs and that this is a barrier that other clergy do not face because Bibles are easily cleared and distributed. Opposition (Docket No. 337) at 4-5. The problems with this argument are emblematic of the weakness of McCollum's entire case. First, he does not explain how this conduct, if true, is a violation of his rights. He does not cite any case that suggests that he–or anyone–has a right to send anything to an inmate. This is an issue that must be raised by an inmate, not McCollum. Second, McCollum has not submitted any evidence of disparate

7

treatment. The same rule applies to all religious items, not just items requested by Wiccan inmates.

Next, McCollum argues that he is subjected to more rigorous security scrutiny. He complains that Ed Crain, a former volunteer Protestant Chaplain at Corcoran, had access to the prison without an escort. McCollum, on the other hand, was required to have an escort. Defendants do not dispute the differential treatment; instead they explain that Crain and McCollum are not similarly situated and that Crain was the exception while McCollum was treated the same as all other volunteer clergy. All religious volunteers at Corcoran require escorts inside the secured perimeter. There is an exception, however, for volunteers who receive religious training at Corcoran, volunteer at Corcoran at least four days a week, and volunteer for an extended time period so that Corcoran officials can determine that the volunteer does not pose a security risk. The only volunteer who has met that criteria is Crain. Sabina Johnson Decl. (Docket No. 305) at ¶ 4. McCollum has not submitted any evidence that disputes defendants' evidence; accordingly, no reasonable trier of fact could find that officials at CDC Corcoran treated him differently because he is a Wiccan. See Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005) (explaining that an equal protection plaintiff bears the burden of proving that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").

McCollum claims further that he submitted numerous clearance requests to Sabina Johnson, which she ignored. McCollum's evidence demonstrates that most of these claims are time barred; there is apparently one unacted upon request from 2005, but there is no evidence that McCollum was treated differently from any other volunteer clergy seeking clearance.

McCollum also complains that he was not invited to serve on a committee that was established to address religious accommodation issues and that the committees which decide whether requested religious items are necessary to practice religion do not include Wiccan representatives. These complaints do not rise to an equal protection violation against McCollum; rather, the issue is whether the inmates' rights to free exercise of religion are

8

being denied *or* whether the refusal to include a Wiccan representative on the committees is an unlawful establishment of religion. McCollum has not suffered a cognizable injury by not being invited to serve on these committees. See <u>Schmeir v. U.S. Court of Appeals for Ninth Circuit</u>, 279 F.3d 817, 821 (9th Cir. 2002).

The derogatory comments made by (often unidentified) CDCR personnel also do not amount to a violation of McCollum's equal protection rights. See <u>Freeman v. Arpaio</u>, 125 F.3d 732, 738 (9th Cir. 1997) ("[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.") (internal quotation marks and citations omitted), abrogated on other grounds by <u>Shakur v. Schriro</u>, 514 F.3d 878 (9th Cir. 2008). While such statements could be evidence of discriminatory intent assuming McCollum offers evidence of who made the statements, the statements themselves are not a deprivation of his constitutional rights.

In sum, McCollum's sincere belief that defendants' treat him unfairly because of his religion is inadequate to support a finding of a constitutional violation. McCollum must instead produce evidence of "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). He has not done so. Defendants' summary judgment motion on McCollum's equal protection claims must be granted.

### III.    **The Retaliation Claims**

McCollum also brings a First Amendment retaliation claim. To succeed on such a claim a plaintiff must prove "(1) the loss of a valuable government benefit (2) in retaliation for [his or her] speech (3) on a matter of public concern." <u>Hyland v. Wonder</u>, 117 F.3d 405, 412 (9th Cir. 1997). The plaintiff must establish that his speech was a "substantial or motivating factor" for the defendants' decision to deprive him of a valuable government benefit. <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 807-08 (9th Cir. 2004). If the plaintiff does so, the defendants can escape liability only if they demonstrate by a preponderance of the evidence that that they would have taken the same action absent the plaintiff's protected conduct. <u>Allen v. Iranon</u>, 283 F.3d 1070, 1974 (9th Cir. 2002).

McCollum alleges that Barry Smith, a Community Resource Manager at CDCR headquarters, and Sabrina Johnson, Community Resource Manager at Corcoran State Prison, retaliated against him for speaking against the CDCR's mistreatment of Wiccans.

**1.     Barry Smith**

Most of McCollum's claims against Smith are barred by the statute of limitations. For example, McCollum complains that *in 2002* Smith falsely told others, including a Los Angeles Times reporter, that McCollum had misrepresented himself as a CDCR Wiccan Chaplain rather than a volunteer chaplain; since this conduct occurred before January 3, 2003 it is not actionable.

McCollum also complains that Smith "denigrated" McCollum while addressing a group of Protestant chaplains. (Exh. 46, ¶ 48) Such conduct, even if true, did not result in the loss of a "valuable government benefit" sufficient to support a First Amendment retaliation claim.

Finally, McCollum asserts that in 2008 Smith retaliated against McCollum by refusing to hire McCollum as the Community Partnership Manager at Central California Women's Facility in Chowchilla and the Valley State Prison. Assuming that Smith was involved in the decisions not to hire McCollum, defendants have produced evidence that demonstrates that their decision not to hire McCollum was based on the superior qualifications of those ultimately hired rather than McCollum's religion. McCollum has not produced any evidence that creates a genuine dispute as to the reasons McCollum was not hired. Although the Court ordered defendants to produce evidence as to those hired over McCollum (Docket No. 346), McCollum has not sought to supplement his opposition with such evidence. Accordingly, no reasonable trier of fact could find that McCollum was not hired in retaliation for his complaints about the CDCR's treatment of Wiccans.

**2.     Sabina Johnson**

Johnson is the Community Resource Manager at Corcoran and as such is responsible for its religious programming. McCollum offers evidence that on the first day he met Johnson she expressed concerns about the Wiccan faith as well as her belief that it is not

actually a religion. He has also submitted evidence that creates a reasonable inference that Johnson was aware that McCollum had complained about her attitude toward and treatment of Wiccans. His retaliation claim nonetheless fails because he has not produced evidence sufficient to support a finding that Johnson deprived him of a valuable government benefit in retaliation for his complaints.

First, McCollum contends that in 2001 and 2002 Johnson obstructed McCollum's ability to visit Corcoran and provide religious services. These claims are time barred.

Next, McCollum contends that Johnson failed to deliver a book to an inmate that she had promised to deliver and told him she had delivered. This allegation, even if true, does not constitute *McCollum's* loss of a valuable government benefit.

McCollum's primary complaint is about the suspension of his Corcoran volunteer clergy privileges. In or around December 2007/January 2008, Johnson approved McCollum's security clearance as a Corcoran religious volunteer. On February 29, 2008, McCollum traveled to Corcoran to visit inmate Michael Thurman. Thurman had successfully pursued an inmate appeal regarding the denial of Asatru services and artifacts in the Security Housing Unit ("SHU") and, according to McCollum, the Associate Warden had asked McCollum to visit the inmate. The SHU is a maximum security unit. Prior to his visit McCollum received a "clearance information and approval" form from Corcoran Chaplain El-Amin which indicated McCollum would not require an escort while visiting Corcoran.

After McCollum visited Thurman, and while he was waiting in the administration lobby for the Associate Warden, he was confronted by Johnson. She informed McCollum that she knew who he was because of this lawsuit and accused McCollum of entering the institution without having been cleared; McCollum explained that he had been cleared and Johnson responded that if that were true she would have known. After McCollum informed Johnson that he had visited the SHU, Johnson retorted that McCollum could not enter the unit without an escort. McCollum explained that he had been given paperwork confirming that he did not require an escort. Johnson then directed McCollum to wait in the snack bar.

11

1 A Corcoran officer met him there and confiscated his volunteer identification on the ground
2 that he had entered the SHU without clearance or an escort.  The identification was returned
3 to McCollum after a seven-month investigation and his volunteer privileges were reinstated
4 on the condition that he complete a volunteer orientation.

5 The confiscation of McCollum's chaplain identification–thus impeding his ability to
6 provide volunteer chaplain services–is a deprivation of a valuable government benefit.  See
7 Hyland, 117 F.3d at 412.  The critical issue is whether McCollum has produced evidence
8 sufficient to support a finding that he engaged in protected speech and that that speech was a
9 substantial or motivating factor in defendants' decision to revoke his volunteer privileges.
10 Allen, 283 F.3d at 1074.  He has not.

11 The evidence is insufficient to support a finding that Johnson–the person alleged to
12 have the retaliatory motive–was responsible for the decision to suspend McCollum's
13 volunteer privileges.  While it is undisputed that Johnson is the first person to have
14 complained that McCollum entered the SHU without an escort, and that she also complained
15 that McCollum had represented himself as a CDCR staff chaplain, defendants' evidence
16 demonstrates that she was not involved in the decision to suspend his Corcoran volunteer
17 privileges.  Johnson avers that she did not decide or even request that Corcoran investigate
18 the incident; nor did she decide or request that Corcoran confiscate McCollum's
19 identification card.  She also testifies that she had no responsibility for the investigation into
20 the incident and no input into whether his volunteer privileges should be reinstated.
21 Rafael Flores, the Investigative Services Captain at Corcoran, testifies that he approved the
22 confiscation of McCollum's identification card pending an investigation into McCollum
23 accessing the SHU without an escort and that he personally took possession of McCollum's
24 identification that day.  Chief Deputy Warden Lopez ordered the investigation which was
25 supervised by Flores.

26 McCollum does not identify any evidence that suggests that his prior complaints
27 about the treatment of Wiccans was a motivating factor in Flores and Lopez's decision to
28 suspend McCollum's volunteer privileges.  To the contrary, the undisputed evidence

12

demonstrates that all Corcoran religious volunteers require an escort to access the SHU and that Flores and Lopez suspended his volunteer privileges because that rule was violated. Indeed, the year before the suspension of McCollum's privileges a Catholic nun had her Corcoran volunteer privileges suspended and then ultimately revoked for visiting the SHU without an escort. While it is true that the Corcoran Chaplain advised McCollum that he did not require an escort, there is no evidence in the record that suggests that Flores or Lopez were aware of that advice at the time it was given and there is no evidence that other volunteers had been allowed to visit the SHU without an escort (other than Ed Crain, discussed, supra, at p. 8).

Defendants have withheld certain documents from McCollum related to this claim based on the deliberative process privilege. The Court has reviewed the documents and concludes that they were properly withheld and, in any event, they do not create a genuine issue of material fact as to whether the suspension of McCollum's Corcoran volunteer privileges was retaliatory.

## CONCLUSION

McCollum has presented evidence which gives rise to a reasonable inference of hostility from some CDCR officials to the accommodation of the religious beliefs of Wiccan and other Pagan inmates. Such hostility, however, does not constitute a violation of McCollum's constitutional rights.

First, any claims based on conduct that occurred prior to January 1, 2003 are barred by the statute of limitations. The continuing violation doctrine does not apply and the EEOC charge did not toll the statute as to the claims presently in this action.

Second, the equal protection claims that remain fail because (1) McCollum's evidence is insufficient to support a finding of a constitutional violation, or (2) they are based on violations of the inmates' rights rather than McCollum's rights.

Third, the only possible timely First Amendment retaliation claims are the (1) failure to hire McCollum in 2007 for two Community Resource Manager positions, and (2) the February 2008 Corcoran incident. As for the latter, there is no evidence that Johnson–the

person with the alleged retaliatory motive–made the decision to suspend McCollum's visiting privileges. As to the former, McCollum has not submitted any evidence that suggests that he was more qualified than those hired; thus, no reasonable trier of fact could find that he was not hired in retaliation for his complaints about the CDCR's treatment of Wiccans. Accordingly, defendants' motion for summary judgment on McCollum's equal protection and retaliation claims is GRANTED.

The parties shall appear at 8:30 a.m. on March 13, 2009, for a case management conference to discuss resolution of the claims remaining in this lawsuit.

**IT IS SO ORDERED.**

Dated: Feb. 23, 2009



CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2004\3339\Dec.12hearing\orderremccollumepretaliation.wpd

14