**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PATRICK M. MCCOLLUM; IAN SHANE
DUNCAN; KENNETH E. CAPOGRECO;
DONNIE DACUS; SCOTT FORREST
COLLINS; KEVIN COY ILOFF; DAVID
SPOONER; GREGORY L. MOURLAND,
individually and on behalf of all
others similarly situated,

*Plaintiffs-Appellants,*

v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION;
OFFICE OF COMMUNITY RESOURCES;
CALIFORNIA STATE PERSONNEL
BOARD; AVENAL STATE PRISON;
CALIFORNIA CORRECTIONAL CENTER;
CALIFORNIA CORRECTIONAL
INSTITUTION; CALIFORNIA
INSTITUTION FOR MEN; CALIFORNIA
INSTITUTION FOR WOMEN;
CALIFORNIA MEN'S COLONY;
CALIFORNIA MEDICAL FACILITY;
CALIFORNIA REHABILITATION
CENTER; CALIFORNIA STATE PRISON,
LOS ANGELES COUNTY; CALIFORNIA
STATE PRISON, SACRAMENTO;
CALIFORNIA STATE PRISON, SOLANO;

7157

California Substance Abuse
Treatment Facility and State
Prison at Corcoran; Calipatria
State Prison; California State
Prison, Centinela; Chuckawalla
Valley State Prison; Corcoran
State Prison; Correctional
Training Facility; Deuel
Vocational Institution; Folsom
State Prison; High Desert State
Prison; Ironwood State Prison;
Mule Creek State Prison; North
Kern State Prison; Pelican Bay
State Prison; Pleasant Valley
State Prison; R.J. Donovan
Correctional Facility at Rock
Mountain; Salinas Valley State
Prison; San Quentin State
Prison; Valley State Prison for
Women; Wasco State Prison;
Kathy Mendoza-Powers;
Kathleen Prosper; William
Sullivan; M. E. Poulos; Dawn
Davison; John Marshall; Martin
Veal; Guillermina Hall; Robert
Ayers; Scott M. Kernan; Thomas
L. Carey; Derral G. Adams;
George Giurbino; J. Salazar;
Madelene A. Muntz; A. K.
Scribner; Anthony Kane; Steve
Moore; Matthew Kramer; T.
Felker;

DERRICK OLLISON; ROSANNE
CAMPBELL; LEA ANN CHRONES;
RICHARD KIRKLAND; JAMES A.
YATES; ROBERT J. HERNANDEZ;
MIKE EVANS; STEVEN ORONSKI;
GLORIA HENRY; P.L. VAZQUEZ;
WILLIAM ELKINS; MAELEY TOM;
ANNE SHEEHAN; SEAN HARRIGAN;
FLOYD SHIMOMURA; RON
ALVARADO; RODERICK Q. HICKMAN;
JEANNE S. WOODFORD; RONALD
BARNES; BARRY SMITH; MERRIE
KOSHELL; OCTAVIO PERAZA;
ARNOLD ORTEGA; AL BONILLA;
SABRINA JOHNSON; JORGE SARELI;
TIP KENDAL; ITO NEINHUIS; K. J.
WILLIAMS; STEWART, Chaplain;
RICHIE, Chaplain; VALENZUELA,
Chaplain; EDMUND G. BROWN,
                *Defendants-Appellees.*

No. 09-16404

D.C. No.
3:04-cv-03339-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
October 7, 2010—San Francisco, California

Filed June 1, 2011

McCollum v. CDCR

Before: Mary M. Schroeder,[1] Barry G. Silverman, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

---

[1] Judge Schroeder was drawn to replace Judge Thompson on this panel after his death.

## COUNSEL

Caroline N. Mitchell, David C. Kiernan (argued), Matthew J. Silveira, and Michael T. Scott, Jones Day, San Francisco, California; Nicole C. H. Massey and Dennis Murashko, Jones Day, Chicago, Illinois; and Paul R. Gugliuzza, Jones Day, Washington, DC, for the plaintiffs-appellants.

Edmund G. Brown, Fiel D. Tigno, Joshua C. Irwin (argued), David A. Carrillo, Bonnie J. Chen, Michael D. Gowe, Office

of the Attorney General, Oakland, California, for the
defendants-appellees.

---

## OPINION

McKEOWN, Circuit Judge:

Under federal and California law, prison inmates are
afforded a reasonable opportunity to exercise their religious
freedom, consistent with security and other concerns. *See* U.S.
Const., amend. I; Cal. Const., art. I, § 24; 42 U.S.C. § 2000cc-
1; Cal. Penal Code § 2600. Putting that principle into practice
is easier said than done and over time the state has faced a
variety of suits by inmates to establish the contours of their
rights under federal and state law.[2]

In an effort to accommodate inmates' religious needs, the
California Department of Corrections and Rehabilitation
("CDCR") has a paid chaplaincy program that employs Prot-
estant, Catholic, Jewish, Muslim, and Native American
clergy. Those chaplains serve all inmates, but other religions
are also served by volunteer chaplains. The heart of this
appeal is a challenge to the paid chaplaincy program by a
Wiccan volunteer chaplain, Patrick McCollum, and a
small group of inmates. The inmates failed to exhaust their claims
or brought them in a untimely fashion. The added wrinkle in
the suit is that the chaplain is pursuing constitutional claims

---

[2]*See, e.g., Henderson v. Terhune,* 379 F.3d 709, 715 (9th Cir. 2004)
(holding California's prison grooming policy does not violate the Free
Exercise Clause because it is reasonably connected to a legitimate peno-
logical interest); *Resnick v. Adams,* 348 F.3d 763, 771 (9th Cir. 2003)
(requiring an inmate to complete a form before receiving Kosher meals is
not an undue burden on religious exercise); *Duffy v. Cal. State Personnel
Bd.,* 232 Cal. App. 3d 1, 16 (1991) ("The . . . government has an obliga-
tion to, and through prison chaplaincies does, afford reasonable opportuni-
ties to inmates to exercise the religious freedom guaranteed by the First
and Fourteenth Amendments.").

that are derivative of the inmates' claims rather than his own. In short, McCollum claims that, as a Wiccan chaplain, he should be eligible for employment in the paid-chaplaincy program. McCollum attempts to transform his employment discrimination action into an effort to vindicate the inmates' First Amendment rights.

The district court properly dismissed and granted summary judgment in favor of the defendants on McCollum's claims because, for the most part, he lacked standing. As a prudential matter, we agree that the court need not exercise jurisdiction over these derivative claims. Although McCollum had standing to pursue his personal employment claims, and also constitutional claims for differential treatment as a volunteer chaplain and retaliation, ultimately he cannot prevail on those claims. We therefore affirm.

## I. BACKGROUND

### A. THE CHAPLAINCY PROGRAM

Recognizing its obligation to accommodate the religious needs of inmates, CDCR currently offers full- and part-time salaried positions for clergy of five faiths: Protestant, Catholic, Jewish, Muslim, and Native American. Although McCollum labels this program "The Five State-Sanctioned Faiths Policy," as we describe below, CDCR does not have a "policy" intended to restrict the paid-chaplaincy positions to these five faiths in particular—rather, over time the CDCR paid-chaplaincy program has evolved to include these five faiths. Officials indicate future evolution is envisioned as required by inmate needs.

Beginning in approximately 1930, prison inmates were served by chaplains employed by the state, apparently through positions that were denomination-specific. In 1940, the State Personnel Board ("SPB") merged all chaplaincy classes into a single, non-denominational class. In 1957, the SPB created

three new denomination-specific paid chaplaincy classes:
Protestant, Catholic, and Jewish, in order to insure that pro-
jected layoffs did not disparately affect any one religious
group. In 1981, the SPB created a paid Muslim chaplaincy
position at CDCR's request, apparently to accommodate per-
ceived inmate need. In 1989, in response to a consent decree,
CDCR requested and received a paid-chaplaincy position for
a Native American Spiritual Leader.

Likely because the current positions are the result of a pro-
gram that has evolved over more than fifty years and not of
a single policy, CDCR acknowledges that it has not applied
particular criteria to its determinations of the necessity of each
of the current paid positions. However, CDCR alleged as part
of this litigation that in the future it will consider the follow-
ing factors in determining the need for a given paid chap-
laincy position: (1) liturgical needs; (2) religious group size;
(3) existing and alternative means of accommodation; (4)
security; (5) cost; and, (6) other "institutional operational
needs." CDCR also stated that it has applied these criteria and
"determined that a paid Wiccan chaplain is not required."

The paid chaplains are responsible for providing religious
services to inmates of their own faiths, as well as serving the
needs of inmates of other faiths through, among other tasks,
"provid[ing] spiritual and moral guidance to . . . residents"
and "supervis[ing] the arranging of programs conducted in the
institution by visiting religious and allied groups." The paid
chaplains are also responsible for approving religious pro-
gramming "by volunteer community clergy and religious rep-
resentatives." Such volunteers are recruited to meet inmate
needs not directly provided for by paid chaplains. If no
ordained chaplain of a particular faith is able to conduct ser-
vices, the warden has discretion to allow "a qualified inmate
to minister to the religious needs of that particular faith."

## B.   Wiccan Inmates in CDCR Custody

Like the district court, we adopt the religious language of
the complaint and use the term "Wiccan" to refer to Wic-

can/Pagan "faith groups consisting of Wiccans, Goddess wor-
shipers, Neo-Pagans, Pagans, Norse Pagans (and any other
ethnic designation), Earth Religionists, Old Religionists, Dru-
ids, Shamans, Asatrus, and those practicing in the Faery, Celt-
ics, Khemetic, Gardnerian, Church of All Worlds,
Reclaiming, Dianic, Alexandrian, Iseum of Isis, Reconstruc-
tionist, Odinist or Yoruban Traditions, and other similar
nature-based faiths."

A concise description of Wiccan religious practices is
found in an expert declaration submitted by plaintiffs:

> Ritual or liturgy is the touchstone of Wiccan/Pagan
> religious identity and community. Wiccans/Pagans
> honor the cycles of nature with rituals at new and
> full moons and on eight seasonal festivals, including
> the solstices and equinoxes. Regular rituals are often
> held in small groups . . . and are typically directed
> by a priestess and/or priest. Rituals are usually held
> in circles and facilitated by ritual leaders who
> explain the purpose of the ritual, invite deities or
> spirits to be present, monitor the group's energy and
> end the ritual in such a way that everyone returns to
> a normal state of consciousness. The ending of the
> ritual usually includes a "grounding" exercise, in
> which the presence of a priest/priestess/minister is
> important to help participants return to a normal state
> of consciousness.

According to a 2002 CDCR survey, there were approxi-
mately 598[3] Wiccan inmates in custody, a number that plain-
tiffs contend excluded the various Wiccans/Pagans included
in plaintiffs' definition of Wiccan. This number compares to
20,901 Protestant inmates, 11,351 Catholic inmates, 1,773
Muslim inmates, 1,482 Native American inmates, 306 Jewish

---

[3]Because the prison population is subject to constant change and due to
inaccuracies in reporting, these figures are estimates only.

inmates, and 4,155 inmates identified as "other." In September 2007, the inmate survey indicated 42,666 Protestant inmates, 28,884 Muslim inmates, 23,160 Catholic inmates, 8,296 Native American inmates, 3,296 Jewish inmates, 183 Wiccan inmates, and 2,678 inmates identified as "other."

## II. The Inmates' Claims

We begin with the inmates' claims, each of which was dismissed by the district court as time-barred or unexhausted. Although there are seven remaining inmate plaintiffs on appeal, the plaintiffs assert arguments for only five inmates in their opening brief. We limit our review to inmates Scott Collins, David Spooner, Donnie Dacus, Kevin Iloff, and Gregory Mourland. *See Image Technical Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1356 (9th Cir. 1998) ("This court will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." (internal quotation marks omitted)). In the opening brief, the plaintiffs also limited their arguments to various challenges related to the chaplaincy hiring policy itself, and our review is similarly cabined by those allegations.[4] *See id.*

To survive a motion to dismiss, the inmates' claims must be both exhausted and timely. We determine whether an inmate's claim has been exhausted by reference to the prison's own grievance requirements, *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), which necessitate that the inmate "describe the problem and action requested," Cal. Code Regs. § 3084.2(a). While an inmate need not articulate a precise legal theory, "a grievance [only] suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Griffin*, 557 F.3d at 1120.

---

[4]The district court found various inmates' claims alleging CDCR practices (not the paid-chaplaincy program per se) burdened their free exercise rights, had been exhausted, and thus survived the motion to dismiss. The plaintiffs voluntarily dismissed those claims to pursue this appeal.

[1] The district court correctly concluded that the claims by Spooner, Iloff, Dacus, and Mourland failed to alert CDCR that the grievance sought redress for the wrongs allegedly perpetuated by the chaplaincy-hiring program itself. Spooner's grievance stated that CDCR did not have a full-time chaplain, but did not suggest a full-time chaplain was required, instead proposing that Spooner himself serve as an inmate minister. Iloff's grievance alleged religious discrimination in the form of unequal access to worship spaces. Dascus similarly grieved of inadequate access to sacred items and generally inadequate accommodations of minority religions. Mourland alleged insufficient access to Wiccan vendors of religious materials. These grievances give notice that inmates allege the prison policies fail to provide for certain general Wiccan religious needs and free exercise, but do not provide notice that the source of the perceived problem is the absence of a paid Wiccan chaplaincy. *See Griffin*, 557 F.3d at 1120. We therefore affirm the district court's finding that the inmates' challenges to the paid-chaplaincy policy are unexhausted because the grievances did not provide notice that the program "in and of itself burdens the exercise of their religion." The district court found that the grievances exhausted the inmates' claims based on prison accommodation of their religious needs[5]—but not based directly on the *chaplaincy program*.

Collins, however, was more specific in his grievance. In a grievance related to his hospitalization from March 31, 2002 through April 9, 2002, Collins alleges he "requested that the prison's administration contact and allow visitation by clergy of [his] own Wiccan faith. This was denied . . . because [his] chaplain was not a regular paid chaplain at San Quentin, i.e., not Christian/Protestant/Catholic, Muslim, or Native American." This grievance was sufficient to put CDCR on notice that the paid-chaplaincy hiring policy was the root cause of Collins's complaint and thus preserved his ability to challenge that policy. Collins was not required to articulate the precise

---

[5]The exhausted claims are not before us in this appeal.

legal theory upon which his claim was based in the administrative grievance process. *See Griffin*, 557 F.3d at 1120.

The plaintiffs conceded that claims arising before January 1, 2003 were time-barred. Collins's complaint is time-barred unless he "can 'show a systematic policy or practice that operated, in part, within the limitations period — a systematic violation.' " *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957, 973-74 (9th Cir. 2010) (quoting *Douglas v. Cal. Department. of Youth Auth.*, 271 F.3d 812, 822 (9th Cir. 2001)).

**[2]** The district court correctly concluded that Collins's complaint was based on a discrete incident—the denial of chaplain services while he was hospitalized in 2002—and thus cannot be classified as a continuing violation. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Collins never filed a grievance citing repeated denials of chaplaincy services as a result of the policy, nor did Collins refer back to his hospitalization in subsequent grievances during the limitations period. Because Collins failed to inform CDCR that the paid-chaplaincy program caused him any harm during the limitations period, he cannot succeed on his continuing violation claim now. *See Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 638-39 (9th Cir. 2002) (to exhaust a continuing violation claim, a plaintiff must put the agency on notice of the continuing nature of the claim). That the prior grievance was *related* to his current claim is insufficient. *See Morgan*, 536 U.S. at 109.

We affirm the district court's dismissal of the inmates' claims at issue in this appeal.

## III.  McCollum's Claims

The essence of McCollum's appeal is that the internal prison process for determining paid chaplaincy positions is flawed and that, as a Wiccan chaplain, he was denied the

opportunity to compete for such a position. He challenges the program under the Establishment Clause of the First Amendment and claims that CDCR officials violated his free exercise and equal protection rights, as well as the inmates' religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He also appeals dismissal of his claims under Title VII, the California Fair Employment and Housing Act ("FEHA"), and 42 U.S.C. § 1983. Finally, McCollum alleges that a CDCR official retaliated against him in violation of the Establishment Clause.

McCollum's claims fall into three categories: (1) claims that are derivative of the inmates' free exercise rights; (2) claims that stem directly from McCollum's position as a volunteer chaplain and potential paid chaplain; and, (3) a statutory claim under RLUIPA. We address each category in turn.

## A. McCollum's Claims That Are Derivative of the Inmates' Rights

Although McCollum complains that he is not eligible to be hired as a prison chaplain, the introduction to his brief highlights the gravaman of his complaint: "By only hiring a chaplain of the Five Faiths, this policy has the pernicious effect of depriving inmates of other religious accommodations, including access to services, worship spaces and religious items, that are afforded to Five Faith inmates." This statement underscores that the entire chaplaincy program derives from the inmates' rights, not those of any putative chaplains.

### 1. McCollum Does Not Assert His Own Rights and Does Not Meet the Standard for Third Party Prudential Standing.

[3] McCollum argues that he meets the requirements for traditional Article III standing: an injury in fact that is fairly traceable to the challenged conduct and has some likelihood of redressability. *Lujan v. Defenders of Wildlife*, 504 U.S.

McCollum v. CDCR

555, 556-61 (1992). McCollum's injury in fact is clear: he was denied the opportunity to apply for a paid-chaplaincy position. *See Gratz v. Bollinger*, 539 U.S. 244, 261 (2003) (intent to apply is sufficient to demonstrate an injury in fact for an equal protection challenge to admissions policy). Whether he has demonstrated causation and redressability is a more difficult question, particularly because he challenges not so much the program itself—that is, the state's provision of paid sectarian chaplains—but instead the process through which the program has evolved. We need not parse this important subtlety because we assume without deciding[6] that McCollum has met the requirements for Article III standing to challenge the program in general. *See Larson v. Valente*, 456 U.S. 228, 242-43 (1982) (where allegedly unconstitutional policy causes injury, order invalidating policy can redress injury); *Catholic League for Religious and Civil Rights v. City of S.F.*, 624 F.3d 1043, 1053 (9th Cir. 2010) (en banc) (same).

   **[4]** Our standing inquiry does not end with the threshold constitutional question. Even where plaintiffs meet the bare minimum of the Article III case or controversy requirement, we typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff. *See Singleton v. Wulff*, 428 U.S. 106, 113 (1976); *see also Powers v. Ohio*, 499 U.S. 400, 409-10 (1991).

   We have explained this prudential limitation on standing as follows:

---

   [6]We may assume Article III standing without "violat[ing] the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits," because we uphold dismissal of these claims not on the underlying merits but instead based on third party prudential standing, a "non-merits ground[ ]." *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 n.2 (9th Cir. 1999) (internal quotation marks and citations omitted).

> Standing doctrine involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. The constitutional aspect inquires whether the plaintiff has made out a case or controversy between himself and the defendant within the meaning of Article III by demonstrating a sufficient personal stake in the outcome. The prudential limitations, in contrast, restrict the grounds a plaintiff may put forward in seeking to vindicate his personal stake. Most important for our purposes is that a litigant must normally assert his own legal interests rather than those of third parties.

*Fleck and Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1103-04 (9th Cir. 2004).

**[5]** McCollum does not contend that the policy of having sectarian chaplains must change to redress his injury, only that prison officials must consider neutral criteria in allocating denomination-specific paid chaplaincy positions. Those neutral criteria, according to McCollum's own claims, must be measures of inmates' free exercise needs.[7] *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) ("[A] chaplain, priest, or minister [is not required to] be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."). As a consequence, we "must hesitate before resolving [this] controversy, even [though it may be] one within [our] constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton*, 428 U.S. at 113.

---

[7]As McCollum's counsel clarified at oral argument, McCollum seeks an order invalidating the current paid-chaplaincy policy, ordering the state to apply neutral criteria in determining which chaplaincies to fund, and ordering the state to give wardens discretion to choose how to implement such policies.

McCollum challenges the deliberative process, or in his view the alleged lack of process, through which prison officials have thus far measured inmates' needs and accommodated inmates' free exercise rights. His claim, at bottom, asserts not his own rights, but those of third party inmates.

**[6]** McCollum's § 1983 claim alleging defendants violated his free exercise rights under the First Amendment "by deliberately impeding his access, as an approved volunteer chaplain, to his prison congregation," is illustrative. We agree with the district court that here, again, McCollum asserts not his own rights, but the free exercise rights of prison inmates. McCollum's right to minister to Wiccan inmates is derivative of the inmates' rights to have access to a minister of their faith, and the inmates' rights in that vein are not absolute. *See Cruz*, 405 U.S. at 322 n.2 (recognizing chaplaincies may be part of prison efforts to offer "reasonable opportunities . . . to all prisoners to exercise the[ir] religious freedom").

**[7]** To demonstrate third party standing, a plaintiff must show his own injury, a close relationship between himself and the parties whose rights he asserts, and the inability of the parties to assert their own rights. *Powers*, 499 U.S. at 409-10. As we have already observed, McCollum has shown an injury in fact. In addition, we assume without deciding that the relationship between a prison chaplain and an inmate to whom he ministers has the requisite degree of closeness to allow for third party standing. *See Powers*, 499 U.S. at 414 (defendant-juror relationship sufficiently close to justify third party standing); *Department of Labor v. Triplett*, 494 U.S. 715 (1990) (attorney-client relationship sufficiently close to justify third party standing); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (doctor-patient relationship sufficiently close to justify third party standing).

**[8]** We agree with the district court that the inmates are able to assert their own rights and that McCollum fails the essential third requirement for standing—a showing that the

rights holders are impeded from asserting their own claims. *See Powers*, 499 U.S. at 409-10. Like the district court, we note that prisoners have challenged the program in this very lawsuit and in at least one similar suit. *See Rouser v. White*, 630 F. Supp. 2d 1165, 1195-98 (E.D. Cal. 2009). Although the inmates' claims here were dismissed primarily for failure to exhaust, presumably they would have the opportunity to bring similar claims in the future if they comply with procedural requirements. It is the inmates, not McCollum, who have standing to pursue the primary claim he articulated, namely, that the chaplaincy policy "has the pernicious effect of depriving inmates of other religious accommodations . . . that are afforded to . . . inmates [of the five faiths]." We conclude that McCollum has not met the requirements for third party standing and we decline to exercise jurisdiction over McCollum's challenges to the paid-chaplaincy hiring program, which include his 42 U.S.C. § 1983 First and Fourteenth Amendment claims challenging the program.

## 2. McCollum Does Not Have Taxpayer Standing.

**[9]** We turn next to whether McCollum, as a California taxpayer, has taxpayer standing. Apart from traditional standing based on direct harm, in limited circumstances individuals may have standing to challenge unconstitutional conduct under the doctrine of taxpayer standing. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. ___; 131 S. Ct. 1436, 1442-44 (2011) (describing limited circumstances in which taxpayer standing may apply); *see also Flast v. Cohen*, 392 U.S. 83 (1968) (establishing test for taxpayer standing).

**[10]** The Supreme Court recently reiterated that taxpayer standing is available only as a "narrow exception" to the general rule that "the mere fact that a plaintiff is a taxpayer is not generally deemed sufficient to establish standing in federal court." *Ariz. Christian Sch.*, 131 S. Ct. at 1440. The Court has repeatedly held that "an individual who has paid taxes [does not have] a 'continuing, legally cognizable interest in ensur-

ing that those funds are not *used* by the Government in a way that violates the Constitution.' " *Id.* at 1442-43 (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) (plurality opinion)). To establish taxpayer standing, the plaintiff must show a "logical link between the plaintiff's taxpayer status and the type of legislative enactment attacked" and "a nexus between [the plaintiff's taxpayer] status and the precise nature of the constitutional infringement alleged." *Id.* at 1451 (citing *Flast*, 392 U.S. at 102).

[11] McCollum's claim lacks the necessary nexus between his taxpayer status and the claimed constitutional violations. *See id.* McCollum does not challenge the expenditure of government funds to provide paid chaplaincies nor even the existence of denomination-specific paid chaplaincies—he challenges only the current allocation of chaplaincies among religious denominations and the procedure for determining such allocations. He lacks taxpayer standing because "the grievance which [he seeks] to litigate here is not a direct dollars-and-cents injury." *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952). We affirm the district court's judgment that McCollum lacks taxpayer standing.

## B.  McCollum's Claims Asserting his own Rights

Apart from claims challenging the chaplaincy program itself, McCollum brings a host of other claims that stem from his personal role as a volunteer Wiccan chaplain and potential applicant for a paid position. As to these claims, the merits of his claims rather than his standing to assert them are at issue.

### 1.  The District Court Properly Dismissed McCollum's Equal Protection Claim.

[12] McCollum's Equal Protection claim stems from complaints that because he is a Wiccan he was treated differently than other volunteer clergy and from paid clergy. He offers a few anecdotal examples, but without much content as to the

basic question of "who, what, where, [and] how" as the district court put it. Nor does he articulate which clergy were similarly situated or how he is similar to these other clergy. Certainly, the claims are missing evidence that any alleged discrimination was intentional. The district court properly dismissed his § 1983 differential treatment claims. *See Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003) (to survive summary judgment on an equal protection claim, a plaintiff must raise an issue of triable fact as to whether defendants intentionally treated the plaintiff differently from similarly situated individuals).

## 2. THE DISTRICT COURT PROPERLY DISMISSED MCCOLLUM'S TITLE VII AND FEHA CLAIMS.

McCollum claims the paid-chaplaincy program violates Title VII and the California Fair Employment and Housing Act ("FEHA").[8] Title VII provides that an employer may not, subject to "narrow exceptions," refuse to hire an individual based on his religion. *Breiner v. Nev. Department of Corrs.*, 610 F.3d 1202, 1207 (9th Cir. 2010) (citing 42 U.S.C. § 2000e-2(a)(1)). To assert these employment claims, McCollum must meet the minimal requirements of Article III standing—which he does as a result of being denied the opportunity to apply for a paid position. *See id.* Further, because McCollum asserts his own rights, there is no prudential bar to adjudicating his Title VII and FEHA claims.

[13] One key exception to Title VII's prohibition on hiring on the basis of religion is applicable if "a bona fide occupational qualification ['BFOQ'] reasonably necessary to the normal operation of that particular business or enterprise" exists. 42 U.S.C. § 2000e-2(e)(1). The district court dismissed

---

[8]McCollum treats his FEHA claim as coextensive with his Title VII claim, and we follow suit. The statutes both contain the bona fide occupational qualification exception that defeats McCollum's claim. *See* 42 U.S.C. § 2000e-2(e)(1); Cal. Gov't. Code § 12940.

Case 3:04-cv-03339-CRB Document 416 Filed 06/13/11 Page 20 of 23

McCollum's employment claims based on its finding that the paid chaplaincies were permitted under the BFOQ exception. We agree.

The job descriptions for paid chaplaincy positions require that the chaplain be a clergy of the denominated faith in order to conduct his or her duties. For example, as the district court found, "McCollum cannot reasonably dispute that to require one to be a Roman Catholic accredited priest in order to, for example, provide communion to Catholic inmates, is a BFOQ." In light of the district court's contemporaneous finding that "it is not reasonably disputed that . . . [the paid chaplaincy program was] adopted . . . to accommodate the religious beliefs of inmates," this qualification is not pretextual but instead necessary to the operation of the chaplaincy enterprise—meeting inmates' free exercise needs. *See* 42 U.S.C. § 2000e-2(e)(1). Further, McCollum opposed summary judgment on the ground that the BFOQ exception could not justify an unconstitutional job classification, but the district court properly found, as we have held here, that whether the classifications are a constitutional means of accommodating inmates' free exercise rights is a question of the inmates' rights, not a question of McCollum's own rights.

**[14]** We affirm the district court's dismissal of these claims without prejudice, and hold that absent a court decision establishing that the paid chaplaincy positions violate inmates' rights and thus are not necessary to the operation of the program or that the Wiccan inmates should be provided a paid chaplain, McCollum cannot proceed with these claims.

### 3. Tʜᴇ Dɪsᴛʀɪᴄᴛ Cᴏᴜʀᴛ Pʀᴏᴘᴇʀʟʏ Dɪsᴍɪssᴇᴅ McCᴏʟʟᴜᴍ's Rᴇᴛᴀʟɪᴀᴛɪᴏɴ Cʟᴀɪᴍ.

McCollum alleges that Sabrina Johnson retaliated against him for filing this lawsuit by making a false allegation that McCollum misrepresented himself as a paid-chaplain on a visit to CDCR's Corcoran facility in February 2008. John-

son's allegation launched an investigation that resulted in McCollum losing access to the facility for seven months. The district court granted summary judgment for Johnson on this claim because it found the evidence did not show that Johnson was "involved in the decision to suspend McCollum's volunteer privileges." This conclusion is inconsistent with our case law. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) (a false accusation may constitute retaliation where deprivation of a benefit "was the natural and proximate result of" that accusation and one can infer based on the facts alleged that the accuser "intended that result"). We may, however, affirm on any ground supported by the record. *O'Guinn v. Lovelock Correctional Center,* 502 F.3d 1056, 1059 (9th Cir. 2007). We affirm because McCollum has failed to meet his burden to raise a genuine issue of material fact as to retaliatory motive.

McCollum alleges that Johnson retaliated against him for filing this lawsuit. Even assuming, without deciding, that McCollum has raised a viable constitutional claim, he cannot succeed. To raise a triable issue as to motive, McCollum must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002). Here, no direct evidence of motive was offered—only evidence that Johnson knew of the lawsuit.

To survive summary judgment, McCollum was required to present circumstantial evidence of motive, which usually includes: "(1) proximity in time between protected speech and the alleged retaliation ; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual." *Id.*

**[15]** The incident in question took place in February 2008. The first amended complaint in this action, naming Johnson as a defendant, was filed in May 2005, nearly three years

before the incident occurred. Thus, the timing of the incident does not support an inference of motive. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir.2004) (a thirteen month lapse is too long to support an inference of causality).

Further, McCollum does not provide any evidence that Johnson opposed the lawsuit—his declaration states only that Johnson was aware of the lawsuit. In his deposition, McCollum claimed the interaction "progressed into [Johnson] starting to attack [McCollum] and make all kinds of statements and take [his] ID card and go through this whole process." In his previously filed declaration, however, McCollum explains that "this whole process" was an inquiry by Johnson as to whether McCollum had been hired as a state chaplain or cleared to visit inmates without an escort on that day. Even viewing this evidence in the light most favorable to McCollum, as we must, this evidence is insufficient to raise a genuine issue of material fact as to retaliatory motive. *See Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (where plaintiff relies on circumstantial evidence to show retaliation, that evidence must be specific to defeat the motion for summary judgment).

Finally, despite his many arguments that Johnson's allegation was false, McCollum provides no evidence that Johnson's allegation was, in fact, false. *See Flaherty v. Warehousemen, Garage & Service Station Employees' Local Union No. 334*, 574 F.2d 484, 486 n. 2 (9th Cir. 1978) (assertions made in complaint, legal memoranda, or oral argument are not evidence and do not create issues of fact). We affirm the district court's summary judgment in favor of Johnson on McCollum's retaliation claim.

## C. McCollum's RLUIPA Claims

[16] McCollum also argues that CDCR's alleged actions impeding his access to CDCR facilities violated RLUIPA's prohibition of "impos[ing] [a] substantial burden on the reli-

McCollum v. CDCR                    7181

gious exercise of a person residing in or confined to an institution," unless that imposition "is in furtherance of a compelling governmental interest; and [ ] is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). This claim necessarily fails because McCollum is not a person residing in or confined to an institution. *See Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005) ("RLUIPA thus protects *institutionalized persons* who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." (emphasis added)).

**AFFIRMED**.